## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 29 2017, 10:21 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Thomas P. Keller<br>South Bend, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana<br><br>Ellen H. Meilaender<br>Supervising Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael Jackson,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | November 29, 2017<br><br>Court of Appeals Case No.<br>71A03-1707-CR-1733<br><br>Appeal from the St. Joseph Superior Court<br><br>The Honorable Jeffrey L. Sanford, Judge<br><br>Trial Court Cause No.<br>71D03-1604-F1-9 |

**Pyle, Judge.**

# Statement of the Case

Michael Jackson ("Jackson") appeals his convictions for Level 5 felony battery resulting in serious bodily injury;[1] Level 1 felony rape;[2] and Level 3 felony criminal confinement.[3] He argues that: (1) his convictions for Level 5 felony battery resulting in serious bodily injury and Level 3 felony criminal confinement violated the continuous crime doctrine; and (2) there was insufficient evidence to rebut his claim of self-defense. Because we conclude that Jackson's convictions did not violate the continuous crime doctrine and because there was sufficient evidence to rebut Jackson's claim of self-defense, we affirm the trial court's judgment.

We affirm.

# Issues

1. Whether Jackson's convictions for Level 5 felony battery resulting in serious bodily injury and Level 3 felony criminal confinement violated the continuous crime doctrine.

2. Whether there was sufficient evidence to rebut Jackson's claim of self-defense.

---

[1] IND. CODE § 35-42-2-1.

[2] I.C. § 35-42-4-1.

[3] I.C. § 35-42-3-3.

# Facts

As of April 2016, Jackson had dated L.W. "off and on" for eight years, although L.W. had also begun seeing another man. (Tr. Vol. 2 at 12). On the night of April 26, 2016, L.W. went to Jackson's house so that they could talk. At Jackson's house, L.W. sat on the toilet in Jackson's bathroom while he was taking a bath so that she could keep him company. While they were talking, Jackson brought up the topic of the other man L.W. was seeing. L.W. did not want to discuss the other man with him, so she stood up to leave.

At that point, Jackson got out of the tub and blocked the bathroom doorway so that L.W. could not leave. L.W. asked Jackson to move, and he told her that she "[was not] going anywhere until [she] answered all of [his] questions. . . ." (Tr. Vol. 2 at 18). L.W. asked again if she could leave, and he said "no," so she "got scared" and "started to cry and hyperventilate." (Tr. Vol. 2 at 18). L.W. tried to push past Jackson, but he pushed her into the sink.

At that point, L.W. saw that Jackson looked angry and "like he wanted to fight," so she drew her gun from its holster in her pants leg and pointed it at him. (Tr. Vol. 2 at 20). She asked Jackson again to move so that she could leave, but he did not do so. Instead, he "rushed [her]" and grabbed her hands so that they were both struggling over the gun. (Tr. Vol. 2 at 20). During this struggle, the gun fell out of L.W.'s hands. She retrieved the gun and told Jackson that she did not want any problems. She just wanted to go. Still, Jackson "rushed [her]" again, and they got into another struggle over the gun.

(Tr. Vol. 2 at 21). The gun again fell onto the ground, but L.W. retrieved it and pointed it at Jackson.

[6] Jackson began to retreat slowly out of the bathroom, and L.W. reiterated that she "[did not] want any trouble;" she "just want[ed] to go." (Tr. Vol. 2 at 22). However, as Jackson backed up, the clip fell out of L.W.'s gun. She "[dove]" to the floor to pick it up. (Tr. Vol. 2 at 22). When she stood up, Jackson was "coming for [her]." (Tr. Vol. 2 at 22). L.W. tried to fire the gun, but it did not fire. Jackson attacked her, and they began to struggle over the gun again. L.W. dropped the gun onto the floor. She ran to the living room and attempted to leave out the front door, but Jackson pulled her back by her hair as she was unlocking the door. He threw L.W. onto the couch, jumped on top of her, and choked her with both hands until she lost consciousness.

[7] L.W. then awoke to a "fiery sensation . . . like a fire [] burning through [her] body." (Tr. Vol. 2 at 26). She jumped up, pushed Jackson off her, and again tried to escape through the living room door. However, Jackson pulled her back by her hair and started to drag her through the house. L.W. tried to stop him by hanging onto a doorway, but he pulled her into a chokehold. L.W. broke free, but Jackson rushed towards her and grabbed her hair again. L.W. fell onto the floor and grabbed his testicles. In response, Jackson twisted L.W.'s hand until it "snapped." (Tr. Vol. 2 at 32).

[8] L.W. started to scream loudly for help, and Jackson dragged her by her hair to the window so that he could shut the window. He then slammed L.W. against

the floor, causing her to hit her head and become dizzy. He took her clothes off and shoved his whole hand "forcefully" into her vagina. (Tr. Vol. 2 at 34). He used so much force that he pushed L.W.'s body across the floor, causing L.W. to lose consciousness again. When she regained consciousness, Jackson was moving her gun in and out of her vagina, saying "[n]ow I'm fucking you with your gun." (Tr. Vol. 2 at 36). After that, L.W. passed out again.

[9] L.W. awoke when Jackson poured water onto her face. The water caused her to cough, choke, and throw up. Jackson got mad at her, saying "You already peed on my floor and now you're throwing up on my floor." (Tr. Vol. 2 at 35-36). He then dragged her by her hair to the bathroom and the toilet, where she passed out again.

[10] Subsequently, Jackson took L.W. to the hospital. When L.W. awoke at the hospital, she was not sure how she had arrived there. South Bend police officer Mollie O'Blenis ("Officer O'Blenis") spoke with L.W. and observed that she had red marks around her neck, upper thigh, and back, was missing hair, and had blood in her underwear. She also had a red stain on her right leg above her knee, which Officer O'Blenis believed was blood. The hospital staff also determined that she had a fractured hand and a small cut or tear in her labia minora, which would have likely been caused by "fairly significant trauma." (Tr. Vol. 2 at 84).

[11] When L.W. returned home from the hospital, she had a voicemail message from Jackson's roommate letting her know that her gun had been left in her

backyard. She also received messages from Jackson on Facebook in the following days. In the messages, Jackson admitted that "[t]hings went to[o] far" and said, "MY SINCERE APOLOGIES!!!" (State's Ex. 27) (emphasis in original). He also offered multiple times to pay L.W.'s rent and said, "we don't need the police involved." (State's Ex. 27). At one point, he asked for her lawyer's number so that he could "know exactly what got to be said and done." (State's Ex. 27).

[12] Detective Casey Hof with the South Bend Police Department investigated L.W.'s sexual assault and found several red stains throughout Jackson's home, which she believed were blood. She tested a red stain on the carpet in the hallway, and the sample tested presumptively positive for blood. She then sent a piece of the carpet for DNA testing, and the State Police Laboratory concluded that the DNA from the carpet was consistent with L.W.'s DNA. Investigators also found L.W.'s DNA on the inside of the barrel of her gun.

[13] On April 28, 2016, the State charged Jackson with Count 1, Level 1 felony rape; Count 2, Level 1 felony rape; Count 3, Level 3 felony criminal confinement; and Count 4, Level 5 felony battery resulting in serious bodily injury. The trial court held a bench trial on March 20-21, 2017. At trial, Jackson's defense was that he had acted out of self-defense towards L.W. He testified that she had pointed her gun at him after they had started to argue and that they had then struggled over the gun. Jackson said that he had wrestled the gun from L.W. through the struggle and had removed the gun's clip and tossed it backwards. However, at that point, according to Jackson, L.W. had run up

to him and grabbed his testicles. Jackson admitted that he had then grabbed L.W.'s hair, punched her in the face five or six times, choked her, banged her head on the floor, and "punched her" in the vagina several times, but he claimed that he had done so in order to make L.W. release his testicles. (Tr. Vol. 2 at 53). He denied that he had ever placed his hand or L.W.'s gun inside of her vagina. At the conclusion of the trial, the trial court took the matter under advisement.

[14] Thereafter, the trial court issued findings of fact and conclusions thereon determining that Jackson was guilty of Level 5 felony battery resulting in serious bodily injury as a lesser-included offense of the charged Level 1 felony rape in Count 1; Level 1 felony rape in Count 2; and Level 3 felony criminal confinement in Count 3. The trial court found Jackson not guilty of Level 5 felony battery resulting in serious bodily injury in Count 4; it concluded that the continuous crime doctrine applied and that, therefore, Jackson could not be convicted of two counts of battery resulting in serious bodily injury. The serious bodily injury underlying Jackson's Count 1 conviction was L.W.'s unconsciousness after Jackson punched her in the vagina. The serious bodily injury used to enhance Jackson's criminal confinement conviction to a Level 3 felony was L.W.'s broken wrist.

[15] The trial court concluded that the State had produced sufficient evidence to rebut Jackson's claim that he had acted in self-defense. It reasoned that, even if Jackson had initially had a reasonable fear of death or great bodily injury when L.W. pointed her gun at him, he had "stopped defending himself and actively

engaged in combat" once the gun was "not in the picture" anymore. (App. Vol. 2 at 36). The trial court sentenced Jackson to three (3) years on Count 1, twenty (20) years on Count 2, and nine (9) years on Count 3 and ordered the sentences to run concurrently for an aggregate sentence of twenty (20) years. Jackson now appeals.

# Decision

On appeal, Jackson argues that: (1) his convictions for Level 5 felony battery resulting in serious bodily injury and criminal confinement as a Level 3 felony violated the continuous crime doctrine; and (2) there was insufficient evidence to rebut his claim of self-defense. We will address each of these arguments in turn.

## 1. Continuous Crime Doctrine

Jackson's first argument is convoluted. He notes that the trial court found that the continuous crime doctrine applied to his offenses, meaning that the offenses were "compressed in terms of time and singleness of purpose and continuity of action as to constitute a single transaction." (App. Vol. 2 at 36) (citing *Chavez v. State*, 988 N.E.2d 1226 (Ind. Ct. App. 2013), *trans. denied*). The continuous crime doctrine provides that, under such circumstances, a defendant cannot be charged multiple times for the same offense. *See Hines v. State*, 30 N.E.3d 1216, 1220 (Ind. 2015). As Jackson notes, the trial court found him not guilty of Count 4, battery resulting in serious bodily injury, based on the continuous

crime doctrine, noting that it had found him guilty of battery resulting in serious bodily injury as a lesser-included offense of his felony rape charge, in Count 1.

[18] Jackson now argues that the continuous crime doctrine also prohibited the trial court from convicting him of two offenses based on L.W.'s serious bodily injuries. Specifically, serious bodily injury was an element of Count 1, battery resulting in serious bodily injury, and also an element used to enhance Jackson's criminal confinement conviction from a Level 5 felony to a Level 3 felony.[4] Jackson argues that the criminal confinement enhancement was prohibited under the continuous crime doctrine and that he should have been convicted of Level 5 felony criminal confinement, instead.

[19] However, Jackson's argument is based on a misinterpretation of the continuous crime doctrine. In *Hines*, our supreme court clarified that the continuous crime doctrine applies only where "a defendant has been charged multiple times with the *same* offense." 30 N.E.3d at 1220 (emphasis added). There, like here, the defendant challenged his convictions for battery and criminal confinement. *Id.* The supreme court noted that battery and criminal confinement were "two distinct chargeable crimes to which the continuous crime doctrine [did] not apply." *Id.* Specifically, the Court reasoned that the defendant "was not convicted of multiple charges of criminal confinement, nor multiple charges of

---

[4] Pursuant to INDIANA CODE § 35-42-3-3(b)(1), criminal confinement is a Level 5 felony if "it results in bodily injury to a person other than the confining person." The offense is a Level 3 felony if it "is committed while armed with a deadly weapon" or "results in serious bodily injury to a person other than the confining person." I.C. § 35-42-3-3(b)(2).

battery. Nor is battery a crime for which all of the elements necessary to impose criminal liability are also elements found in Criminal Confinement, or vice versa." *Id.* Accordingly, the Court held that the continuous crime doctrine did not apply. *See id.* Likewise, we find that the doctrine does not apply here. Even though Jackson's offenses had one element, serious bodily injury, in common, they were distinct offenses.[5]

## 2. Sufficiency

Next, Jackson argues that there was not sufficient evidence to rebut his claim that he acted out of self-defense. A valid claim of self-defense is a legal justification for an otherwise criminal act. *Cole v. State*, 28 N.E.3d 1126, 1137 (Ind. Ct. App. 2015). *See* I.C. § 35-41-3-2(c) (providing that a person is "justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force"). To prevail on a claim of self-defense, a defendant must have: "(1) acted without fault; (2) been in a place where he or she had a right to be; and (3) been in reasonable fear or apprehension of bodily

---

[5] Alternatively, the State interprets Jackson's argument as a double jeopardy argument challenging the use of the same injury—L.W.'s fractured wrist—to enhance two separate convictions. To the extent Jackson intended to raise a double jeopardy argument, we find it waived for failure to state a cogent argument because Jackson did not cite any legal authority to support such an argument. *See Anderson v. State*, 64 N.E.3d 903, 905 n.3 (Ind. Ct. App. 2016) ("Failure to present a cogent argument results in waiver of the issue on appeal."). Waiver notwithstanding, a double jeopardy argument is equally unavailing. Serious bodily injury was an element of Jackson's convictions for both Count 1 and Count 3. However, the serious bodily injury underlying Jackson's Count 1 conviction was L.W.'s unconsciousness following his act of punching her vagina. The serious bodily injury underlying his Count 3 conviction was her broken wrist bone. Therefore, Jackson's two convictions were not enhanced by the same serious bodily injury.

harm." *King v. State*, 61 N.E.3d 1275, 1284 (Ind. Ct. App. 2016), *trans. denied.* "'Where a person has used more force than necessary to repel an attack[,] the right to self-defense is extinguished, and the ultimate result is that the victim then becomes the perpetrator.'" *Weedman v. State*, 21 N.E.3d 873, 892 (Ind. Ct. App. 2014) (quoting *Hollowell v. State*, 707 N.E.2d 1014, 1021 (Ind. Ct. App. 1999)), *trans. denied.*

[21] When a claim of self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements. *King*, 61 N.E.3d at 1283. The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. *Id.* Whether the State has met its burden is a question of fact for the fact-finder to determine. *Cole*, 28 N.E.3d at 1137.

[22] Our standard of review for a challenge to the sufficiency of the evidence rebutting a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Cole*, 28 N.E.3d at 1136-37. We do not reweigh the evidence or judge the credibility of witnesses. *Id.* at 1137. We consider only the probative evidence and reasonable inferences drawn from the evidence that support the verdict. *King*, 61 N.E.3d at 1283. If the defendant is convicted despite a claim of self-defense, this Court will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. *Id.*

[23]     Here, the trial court found that, even if Jackson had initially had a reasonable fear of death or bodily injury, he "could no longer argue that he had a reasonable fear of death or of great bodily injury once the gun was not in the picture." (App. Vol. 2 at 36). Instead, "Jackson stopped defending himself and actively engaged in combat." (App. Vol. 2 at 36). For that reason, the trial court concluded that Jackson's self-defense claim had been rebutted.

[24]     On appeal, Jackson disputes the trial court's conclusion, arguing that he had a reasonable fear of bodily injury after the gun disappeared because L.W. was grabbing his testicles. He also argues that he did not use more force than necessary because he did not use a deadly weapon to defend himself. We find that these arguments are a request to reweigh the evidence, which we will not do. *See Cole*, 28 N.E.3d at 1136-37 (stating that we will not reweigh the evidence or judge the credibility of witnesses). L.W. testified that, after she tried to fire the gun, she dropped the gun during a struggle with Jackson and attempted to run out the living room door. At that point, Jackson pulled her back by her hair and choked her. She passed out and, after she woke up, attempted to escape again. Jackson stopped her, grabbed her by her hair, dragged her throughout the house by her hair, and put her into a chokehold. These acts happened before L.W. tried to grab his testicles. Then, according to L.W.'s testimony, Jackson "snapped" her hand so that it fractured, dragged her by her hair again, shoved his whole hand into her vagina, and pushed her gun in and out of her vagina. (Tr. Vol. 2 at 32). This evidence more than supported the trial court's conclusion that after the gun disappeared, Jackson stopped

defending himself and actively engaged in combat.  Accordingly, we conclude that there was sufficient evidence to rebut Jackson's claim of self-defense.

Affirmed.

Kirsch, J., and Bailey, J., concur.